# EXHIBIT D

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

Case No.:  6:19-cv-1670-PGB-LRH

TERRANCE NELSON CATES,

        Plaintiff,

vs.

ZELTIQ AESTHETICS, INC.

        Defendant.

_____/

## AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiff, by and through his undersigned counsel files this Amended Complaint and Demand for a Jury Trial against Defendant Zeltiq Aesthetics, Inc., and alleges the following:

## NATURE OF THE PROCEEDINGS

1. This lawsuit arises from a medical device manufactured by Defendant, Zeltiq Aesthetics, Inc., called the CoolSculpting System which caused Plaintiff to suffer a physical deformity after undergoing the CoolSculpting procedure.

2. Although, Defendant advertised CoolSculpting as a "nonsurgical" procedure to reduce stubborn fat bulges "in the areas that bother you most," it knew that its CoolSculpting device caused users to develop a condition called Paradoxical Adipose Hyperplasia (PAH), which results in the *opposite effect* of the medical device's purpose. The CoolSculpting device *permanently* changes the structure of the fat cells in the area it targets to reduce and multiplies them, creating a deformity on the user's body much *larger* in size than the original "suborn fat bulge." The condition does not resolve on its own and the fat tissue affected by PAH does not respond to weight loss. Thus, the only method of removing PAH is with surgery. The condition is solely attributed to the CoolSculpting device.

3. Despite knowing about the severity and permanency of the condition, Defendant manipulated, in its favor, important information regarding PAH to induce prospective patients to undergo the CoolSculpting procedure. It did so by making misrepresentations about PAH to CoolSculpting providers and concealing the number of patients who have developed PAH, causing CoolSculpting providers to believe that the condition is not as serious, permanent, and frequent as Defendant knew it to be.

4. As the result of Defendant's conduct, Plaintiff was not aware of the serious risk of undergoing the CoolSculpting procedure before he elected to do so and consequently developed PAH on his abdomen and flanks.

**PARTIES**

5. Plaintiff, Terrance Nelson Cates, is an individual and the citizen on the Commonwealth of the Bahamas.

6. Defendant, Zeltiq Aesthetics, Inc. is a corporation organized and existing under the laws of Delaware with a principal place of business at 4698 Willow Road, Pleasanton, California 94588. On April 28, 2017, Allergan plc acquired Zeltiq Aesthetics, Inc.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction pursuant to 28 U.S.C.§ 1332, in that Plaintiff is a citizen of a state which is different from the state where Defendant is incorporated and has its principal places of business. The amount in controversy far exceeds seventy-five thousand dollars ($75,000.00).

8. The Court has personal jurisdiction over Defendant because it transacts business within the State of Florida, in the jurisdiction of this Court and Plaintiff's causes of action arose from

Case 1:20-cv-01284-NMS   Document 1-4   Filed 05/31/20   Page 4 of 33

the acts, omissions and transactions which occurred in Orlando, Florida and this judicial district.

9. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

10. Defendant, Zeltiq, either directly or through its agents, servants, and employees, created, designed, manufactured, marketed, advertised, distributed, and sold its CoolSculpting System medical device to be used on individuals to induce lipolysis (the breaking down of fat cells) in the body.

### About CoolSculpting

11. Defendant is a medical technology company that manufactures a medical device under the trademark "CoolSculpting."[1]

12. The CoolSculpting device uses a patented process called Cryolipolysis® which was developed by Drs. Richard Rox Anderson and Dieter Manstein at Harvard University and Massachusetts General Hospital.[2]

13. The Cryolipolysis® process works by freezing fat cells without damage to the skin.

14. Defendant was granted an exclusive license to manufacture the CoolSculpting medical device based on this patented process.[3]

15. Cryolipolysis® treatments are intended to address stubborn fat bulges that may not respond to diet or exercise.

---

[1] *Zeltiq Aesthetics, Inc. v. Daron Scherr, M.D. et. al.,* Case. No.: 2:15-cv-00186. ¶ 13.
[2] *Id.* at ¶ 10.
[3] *Id.* at ¶¶ 7, 10.

16. The CoolSculpting device is advertised and marketed as a non-invasive and surgery-free procedure that is an alternative to liposuction and other fat reducing surgeries.

17. The U.S. Food and Drug Administration ("FDA") cleared Zeltiq's Cryolipolysis® device for the performance of Cryolipolysis® services to the flank region, or "love handles," in September 2010, for the abdomen in May 2012, and for the thighs in April 2014.

18. Zeltiq is the only entity in the United States with FDA clearance to offer a device to perform body contouring services using cooling technology.

19. Zeltiq's CoolSculpting device is a Class II prescription medical device that is only sold to companies with a physician or medical director.

20. In order to facilitate Cryolipolysis®, the CoolSculpting device's suction applicators are applied to a person's body and cool the treatment area for 30 to 60 minutes. Each application of the applicator is called a "cycle."  A person may undergo multiple cycles in one CoolSculpting session, depending on the size of the area they desire to treat with Cryolipolysis®.

**Zeltiq's Advertisement of CoolSculpting**

21. Zeltiq has extensively marketed and promoted its CoolSculpting system directly to the public and continues to do so today.[4]

22. Zeltiq advertised CoolSculpting as "#1 nonsurgical fat reduction treatment" and "CoolSculpting® is the treatment doctors use most for nonsurgical reduction."[5]

23. Defendant claimed that the CoolSculpting procedure is "for the treatment of visible fat bulges."[6]

---

[4] Zeltiq Aesthetics, Inc.'s 10-K Report at page 6/153. Attached as *Exhibit A*, PDF page 7/154.
[5] *Exhibit B.*
[6] *Id.* at page 7.

24. Zeltiq's CoolSculpting System has received substantial press coverage in the national media since its clearance by the FDA for non-invasive, cosmetic, body-contouring, including features on television shows such as The Today Show, Good Morning America, The CBS Early Show, The Rachel Ray Show, The Dr. Oz Show, Extra, Nightline, The Doctors, and E! News, and in magazines such as O, Elle, Marie Claire, Allure, Men's Fitness, Town & Country, Elevate, W, and Vie.[7]

25. Zeltiq operated and still operates a website www.coolsculpting.com where it also advertises CoolSculpting directly to the public and refers prospective patients to CoolSculpting providers in their geographical area.

26. In addition to intensely marketing the CoolSculpting device to the general public, Zeltiq aggressively pursued doctor's offices, medical spas, laser hair removal clinics, and other cosmetic procedure establishments to sell its CoolSculpting System device and induce them to add CoolSculpting to their list of medical procedures provided to their cosmetic patients.[8]

**CoolSculpting Providers as Agents of Zeltiq**

27. Zeltiq's relationship with the CoolSculpting providers is different from traditional device manufacturers because its medical device is specifically programmed to only function with the use of consumable cards or "cycles" which CoolSculpting providers *must* buy from Defendant to operate the medical device.[9] "A cycle is an authorization to perform one

---

[7] *Zeltiq Aesthetics, Inc. v. Daron Scherr, M.D. et. al.,* Case. No.: 2:15-cv-00186. ¶15.
[8] Zeltiq Aesthetics, Inc.'s 10-K Report at page 6/153. Attached as *Exhibit A*, PDF page 7/154.
[9] *Id.*

procedure to one specific area on the body; [providers] can only perform a treatment if they have purchased a cycle."[10]

28. A person undergoing the CoolSculpting procedure may undergo multiple cycles during each procedure. For example, Plaintiff did eight (8) cycles in his first CoolSculpting appointment in February 2018.

29. Defendant actually makes more money on selling the consumable cards to CoolSculpting providers than on selling the CoolSculpting devices. In 2018, it made $235.3 million on selling consumable cards and $126.3million on selling the CoolSculpting devices and applicators.[11]

30. A provider cannot use the device without the Defendant's control, through the consumable card system.

31. Zeltiq's website lists local CoolSculpting providers, links directly to their websites and gives prospective patients an option to request a CoolSculpting appointment directly with the providers.

32. Defendant furnishes providers with advertisement materials directed at CoolSculpting patients which describe the benefits of the procedure, such as brochures[12] and posters.[13]

33. Defendant also provides documents and forms to CoolSculpting providers to use in their practice when administering the CoolSculpting procedure to patients.

---

[10] Zeltiq Aesthetics, Inc.'s 10-K Report at page 6/153. Attached as *Exhibit A*, PDF page 7/154.
[11] Allergan Reports Fourth Quarter and Full-Year 2018 Financial Results at page 8-9/23. Attached as *Exhibit C*, PDF page 9-10/24.
[12] Attached as *Exhibit D*.
[13] Attached as *Exhibit E*.

34. The documents, brochures, posters, and forms provided by Defendant to CoolSculpting providers depict the CoolSculpting logo and clearly promote the Defendant's medical device.

35. Defendant also trains CoolSculpting providers on how to sell the CoolSculpting procedure to end users and how to upsell cycles by employing various sales tactics such as using the 90-day follow up appointment to recommend additional CoolSculpting treatments for better results and pre-selling packages for future use.

36. Therefore, after a consumer sees a CoolSculpting advertisement, he or she is directed to visit www.coolsculpting.com, which refers the consumer to a local CoolSculpting provider. When consumer arrives at a CoolSculpting provider's office, he sees CoolSculpting posters and brochures which describe the benefits of the CoolSculpting procedure. The provider sells the procedure to the consumer using specific sales techniques according to the training that the Defendant provided. The provider uses special forms depicting the CoolSculpting trademark logo in administering the procedure. And, the provider pays Defendant a portion of the cycle price charged to the consumer for the CoolSculpting procedure.

37. Ultimately, through a uniquely designed system which Defendant controls, it uses the providers to sell CoolSculpting cycles on its behalf.

**Paradoxical Adipose Hyperplasia "PAH"**

38. Zeltiq knew that its CoolSculpting System device had the ability to cause consumers to develop a condition that results in the opposite effect of the device's advertised purpose.

39. Paradoxical Adipose Hyperplasia, also known as "PAH" and sometimes referred to as Paradoxical Hyperplasia or "PH," is a permanent condition that is developed *only* as the

result of Cryolipolysis®/CoolSculpting. PAH is not known to occur naturally or from any other medical procedure. Therefore, with the invention of the CoolSculpting System device and the process of Cryolipolysis®, a new adverse medical condition was created.

40. The term "Paradoxical Adipose Hyperplasia" was coined in 2014, to describe the condition caused by the CoolSculpting device, just four years before Plaintiff had CoolSculpting.

41. Because PAH is solely attributed to the CoolSculpting medical device, the medical community is not familiar with the condition.

42. PAH changes the structure and size of the fat tissue it affects, making it expand and harden *permanently*, resulting in a protruding mass of fat tissue that is disfiguring to the body.

43. PAH does not resolve on its own. No matter how much weight a person loses after developing PAH, the tissue affected by PAH will never get smaller. The deforming effect of PAH remains *permanently* and can only be removed surgically.

44. A person suffering from PAH either has to live with it forever or try to remove it through plastic surgery. Surgical intervention to alleviate the condition requires general anesthesia and requires multiple surgeries to fully remove the masses resulting from CoolSculpting. As with any surgery, there are aesthetic and health risks, including death.

45. Males are at a higher risk of developing PAH.

46. At this time, the only known prevention of Paradoxical Adipose Hyperplasia is abstinence from CoolSculpting.

**Zeltiq's Knowledge About PAH**

47. Defendant does not know why PAH occurs but is well aware of the serious consequences of developing the condition.

48. PAH was a reportable event under 21 CFR 803 to the Food and Drug Administration since surgical intervention is the only means of resolving the permanently disfiguring condition.

49. As CoolSculpting became more popular, a multitude of PAH reports began pouring in to Zeltiq. Since at least 2012, Zeltiq has received thousands of reports of patients developing "firm bulges" and fat tissue "increases" in the treatment area after undergoing Cryolipolysis® with the CoolSculpting device. The reports noted that the condition could only be alleviated with surgical intervention.

50. Zeltiq was privy to extensive information regarding persons who developed PAH. Zeltiq requested that persons suffering from PAH disclose medical records, photographs, quotes for surgeries, diagnosis information, and any other related documentation in order to "investigate" each claim.

51. Based on the reports it received, Zeltiq knew that the incidence rate of PAH was not as rare as it initially estimated. Likewise, it knew that people with PAH must undergo multiple invasive surgeries to remove it, which are *not* limited to one liposuction and include operations such as abdominoplasty and excision.

52. Zeltiq knew that the surgeries required to remove PAH involve long recoveries, pain, health risks, and financial expenditures. Zeltiq also knew that some people may not want to undergo invasive surgeries after developing PAH because they are not willing to subject themselves to the risks, pain, inconvenience of recovery, or financial burdens of undergoing the reconstructive procedures, leaving them with the deformity for life.

53. By being in possession of information obtained from persons who developed PAH, Zeltiq had superior knowledge about the extent, severity, and frequency of the condition, better than any other person in the world.

**Zeltiq's Representations About PAH**

54. Despite its extensive knowledge about PAH, Zeltiq did not provide adequate warnings and accurate information about PAH to CoolSculpting providers, including the medical spa where Plaintiff underwent the CoolSculpting procedure.

*Written Materials*

55. Although Zeltiq provided *some* information regarding PAH to CoolSculpting providers, it was misleading and written in such a way as to give the providers the impression that the condition causes a less serious effect and is not likely to occur.

56. Zeltiq's "warnings" about PAH to CoolSculpting providers were *inaccurate* in content and *ambiguous* in manner of expression. The language used by Defendant did not relay the seriousness and permanency of the condition.

57. Zeltiq creatively chose words that were ambiguous and did not provide enough specificity on the details that were necessary for a CoolSculpting provider to understand the condition. Zeltiq's limited disclosure about PAH did not apprise Plaintiff's CoolSculpting provider on the deforming nature of PAH, its permanent effect on the body, the frequency of occurrence, that it can only be removed with plastic surgery, and that multiple surgeries will probably be required to remove PAH affected tissue.

58. Zeltiq used the following language to describe the disfiguring condition of PAH in the User Manuals for the CoolSculpting device, dedicating only two lines to inform the provider about the permanent condition, stating:

### Rare Side Effects

- Paradoxical hyperplasia: Visibly enlarged tissue volume within the treatment area, which may develop two to five months after treatment. Surgical intervention may be required.

59. Zeltiq used similar language to describe PAH to CoolSculpting providers in its slide-show presentations which it used during its live training on how to operate the device:

**Rare side effects:**

» Paradoxical hyperplasia: Gradual development of a firmer enlargement, of varying size and shape, of the treatment area, which may develop two to five months after treatment. Surgical intervention may be required.

60. Aside from the language exemplified herein, Zeltiq did not give any additional details or facts in writing about PAH to Plaintiff's CoolSculpting provider.

61. Zeltiq also made statements to Plaintiff's CoolSculpting provider that it had improved its device by using smaller size applicators to administer the cycles which eliminated or significantly reduced the adverse side effects associated with the device.

***Verbal Statements by Zeltiq's Representatives***

62. Zeltiq also used non-medical sales people called Practice Development Managers ("PDM") to provide training to Plaintiff's CoolSculpting provider and to inform the provider about PAH.

63. Zeltiq's PDMs were the primary points of contact for CoolSculpting providers to obtain and relay any information regarding the CoolSculpting device. The PDMs provided training on operating the CoolSculpting device, provided information about the device's side effects, gave marketing advice, relayed information from providers to Zeltiq, and sold consumable cards to the CoolSculpting providers.

64. The PDMs' primary role was to sell Zeltiq's products to the providers. After the providers purchased the CoolSculpting device, the PDMs' role was to ensure that the providers continued to purchase the consumable cards which are required to operate it from Zeltiq.

65. Thus, same persons that were tasked with providing adverse effect information to CoolSculpting providers were also tasked with selling Zeltiq's products to them.

66. During training, Zeltiq's PDMs made verbal statements to Plaintiff's CoolSculpting provider that the likelihood of CoolSculpting patients developing PAH is very low and that the provider will probably not see a case of PAH in their practice.

67. Zeltiq's PDMs did not inform Plaintiff's CoolSculpting provider on the true incidence rate of PAH and made statements that minimized the risk of developing the condition.

68. Zeltiq's PDMs downplayed the seriousness and permanency of the condition to the CoolSculpting providers, including Plaintiff's provider, in order to incentivize the providers to purchase the CoolSculpting devices and sell more cycles to their patients.

### *Paid Consultants' Publications*

69. To support its statements that the likelihood of developing PAH was "rare" Zeltiq used paid consultants to disseminate *inaccurate* information regarding the incidence rate of PAH under the guise of scientific publications. The articles emphasized the rarity of the condition and presented false data to support this claim. The paid consultants' articles cited to other publications written by Zeltiq's paid consultants.

70. For example, in March 2014 several persons with financial conflicts of interest co-authored a scholarly article in which they stated, "We estimate that the incidence rate of PAH is about 0.0051%, or about 1 in 20 000 treated patients."[14]

71. But, contrary to the information provided by Zeltiq's paid consultants, an unbiased author in a scholarly article stated, "The CoolSculpting® manufacturer reports an occurrence rate

---

[14] H. Ray Jalian, Md; Mathew M. Avram, MD, JD; Lilit Garibyan, MD, PhD; Martin C. Mihm, MD; R. Rox Anderson, MD. Paradoxical Adipose Hyperplasia After Cryolipolysis®. *JAMA Dermatology*. 2014 Mar; Vol. 150(3): 317-319.

of paradoxical hyperplasia of 1 in 10,000 patients who received Cryolipolysis® with this procedure (Mr. Brad Hauser, Vice President, Product and Clinical Strategy at ZELTIQ, personal communication, 2013.)"[15] Accordingly, the incidence rate for the same time period was 0.010%, twice higher than the statistic reported by Zeltiq's consultants.

72. Then, in March 2016 a group of unbiased authors addressed the incidence rate of PAH as reported in the March 2014 article written by Zeltiq's consultants, stating, "Our reported incidence is 0.78 percent [1 in 129], more than 100 times higher than the device manufacturer reported incidence of 0.0051 percent. Ours is not a unique experience, as a dermatology practice in Houston, Texas, recently reported a paradoxical adipose hyperplasia incidence of 0.47 percent [1 in 213]. Although our treatment numbers are low when considering the popularity of the procedure, *we believe that paradoxical adipose hyperplasia is underreported*."[16] (emphases added).

73. To which, a paid consultant for Zeltiq wrote a response stating that, "The manufacturer reports that since the first quarter of 2014, the paradoxical adipose hyperplasia incidence rate has fluctuated between 0.021 and 0.026 percent, or approximately one in 4000 treatment cycles."[17]

74. Through a number of scholarly articles written by Zeltiq's paid consultants, the information regarding PAH available to the medical community was skewed in favor of Zeltiq.

---

[15] William A. Stefani, MD, FACS. Adipose Hypertrophy Following Cryolipolysis®. *Aesthetic Surgery Journal*. 2015, Vol. 35(7): NP218-NP220, at NP219.

[16] Emma Kelly, B.A.; Jose Rodriguez-Feliz, M.D.; Michael E. Kelly. Paradoxical Adipose Hyperplasia after Cryolipolysis®: A Report on Incidence and Common Factors Identified in 510 Patients. *Plastic and Reconstructive Surgery.* 2016 Mar; Vol. 137, No. 3. DOI: 10.1097/01.prs.0000480023.35573.b7.

[17] Gordon H. Sasaki. Cryolipolysis® for Fat Reduction and Body Contouring: Safety and Efficacy of Current Treatment Paradigms. *Plastic and Reconstructive Surgery.* 2016 Mar; Vol. 137, No. 3. DOI: 10.1097/01.prs.0000479983.49996.c0.

### *Zeltiq's Reports of PAH to FDA*

75. As part of Zeltiq's scheme of misinforming the CoolSculpting providers and the public about the danger of its device, it furthered its efforts of fabricating an image of rarity of PAH by failing to report *all known* PAH events to the FDA.

76. Due to the permanency and severity of the condition, PAH was a reportable adverse event to the Food and Drug Administration, requiring Zeltiq to report all known PAH events resulting from the use of its CoolSculpting medical device.

77. Since the CoolSculpting system went on the market, Zeltiq has received *at least* 2,827 reports of PAH through September 2019. It reported *less than* 70 to the FDA.

### Effect of Zeltiq's Representations

78. Zeltiq controlled the information that was available about PAH through the written training materials it gave to CoolSculpting providers, the PDMs' statements about PAH to providers, the scholarly publications written by its consultants, and the extensive underreporting of adverse events to the FDA.

79. Therefore, even if a CoolSculpting provider wanted to find out additional information regarding PAH, they would most likely find a Zeltiq-friendly scholarly article on the subject or be pacified by the low number of PAH incidents reported on the FDA's public databased MAUDE (Manufacturer and User Facility Device Experience.)

80. Likewise, although Zeltiq received thousands of reports of people developing PAH after CoolSculpting, it never disclosed to CoolSculpting providers the number of people injured by its device, but simultaneously relied on statements such as "rare" and "a small number of people" to pacify the providers and mislead them into believing that PAH was not a serious risk of using the CoolSculpting device.

81. Zeltiq's representations regarding PAH in its user manuals, slide-show presentations, and training demonstrations by the Practice Development Managers misrepresented the severity and permanency of the condition to Plaintiff's CoolSculpting provider. Furthermore, Defendant's statements about its new applicators caused Plaintiff's CoolSculpting provider to believe that the smaller size applicators resolved any known side effects of the device. Additionally, none of Defendant's advertisement brochures and posters directed at prospective CoolSculpting patients, like Plaintiff, discussed the possibility of developing PAH.[18]

**Plaintiff's CoolSculpting Experience**

82. Plaintiff, Terrance Nelson Cates, began seeing television advertisements on American channels about the miracle of CoolSculpting. The advertisements presented CoolSculpting as a non-invasive fat reducing procedure that requires no down time and reduces suborn fat that will not dissipate despite a healthy diet and regular exercise.

83. Cates became interested in CoolSculpting after seeing the advertisements. He was a healthy man who exercised regularly and observed a wholesome diet, but still had stubborn adipose tissue on his abdomen and flanks which he wanted to decrease.

84. In February 2018, Cates went to a medical spa in Orlando, Florida that offered the CoolSculpting procedure to inquire about having it done. After discussing the CoolSculpting procedure with sales personnel at the medical spa, he was advised that he was a perfect candidate for the procedure. He was shown successful "before and after" photographs of the procedure. Cates was told that he should expect a 20% reduction of the adipose tissue in the treatment areas with each cycle.

---

[18] Attached as *Exhibit B, D, and E.*

85. At no point was Cates advised on his potential risk of developing PAH.

86. The advertising materials about CoolSculpting that were directed at Cates 1) did not mention the risk of developing PAH, 2) did not accurately describe the disfiguring effect of PAH, 3) did not explain that if he develops PAH after CoolSculpting, invasive plastic surgery would be the only option to resolve the condition, and 4) warn that Cates, as a male, had a higher risk of developing PAH.

87. On February 15, 2018, Cates agreed to undergo eight cycles of CoolSculpting on the same day. He received four applications of the CoolSculpting device to his abdomen and two applications on each flank.

88. The CoolSculpting provider did not mention or explain anything about PAH to Plaintiff prior to the procedure and Plaintiff did not have any knowledge about the serious side effect of CoolSculpting.

89. None of the CoolSculpting advertisement materials provided by Defendant and displayed at the provider's office mentioned PAH.[19]

90. When Plaintiff asked whether he should be concerned about any serious side effects of the CoolSculpting procedure, his provider told him that he may experience some tingling sensations which may develop after the procedure, for which the provider could prescribe medication that will resolve it.

91. Plaintiff's CoolSculpting provider also stated to Plaintiff that since Zeltiq implemented the new and improved smaller applicators for its CoolSculpting device he should not worry about suffering any serious side effects.

---

[19] Attached as *Exhibit B, D, and E.*

92. On May 18, 2018, Cates returned to the medical spa for a follow-up visit and underwent two additional cycles of CoolSculpting, one on each flank.

93. The CoolSculpting device that was used on Cates was expected to and did reach Plaintiff without substantial or significant change in condition from which it was manufactured and sold, and was not altered or modified in any way by the medical spa that performed the procedure or any other third party from the condition in which it was designed, manufactured, retailed, distributed, packaged, marketed, promoted, and/or sold by Zeltiq, or its authorized distributors.

94. Upon information and belief, the person performing the CoolSculpting procedure on Cates used the device in a foreseeable and reasonable manner, commensurate and pursuant to the instructions for use accompanying the CoolSculpting device provided by Zeltiq.

95. In about July 2018, Mr. Cates began feeling a hardness above his naval which was approximately eight inches in diameter.

96. The hardened area in his abdomen continued to develop into a well demarcated mass in the shape and size of a bowling ball. The adipose tissue on his flanks grew in size, although Cates lost weight.

97. On October 26, 2018, a dermatologist diagnosed Cates with Paradoxical Adipose Hyperplasia resulting from the CoolSculpting procedure performed using Zeltiq's device.

98. Cates had specifically sought out the CoolSculpting procedure because he adamantly did not want to undergo any invasive surgical procedures.

99. Had Cates been aware that there was a substantial risk of him developing PAH, a permanent disfigurement that can only be resolved by an invasive surgical procedure, he would not have agreed to undergo CoolSculpting.

100. As the direct and proximate result of undergoing the CoolSculpting procedure and use of the Zeltiq's medical device, Cates suffered economic damages as well as non-economic damages which include: permanent disfigurement, emotional distress, mental anguish, pain and suffering.

## COUNT I
## STRICT PRODUCT LIABILITY - DEFECTIVE DESIGN

101. Plaintiff incorporates the substantive allegations contained in Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

102. Defendant is, and at all times mentioned in this Complaint was, engaged in the business of designing, manufacturing, assembling, and selling a medical device product known as CoolSculpting System with the purpose of gaining profits from the distribution thereof.

103. Defendant intended that the subject product be used in the way in which it was used on the Plaintiff.

104. Defendant's design of the CoolSculpting System medical device was unreasonably dangerous, unsafe, and/or defective for use on Plaintiff at the time it left the Defendant's control as well as when it was used on Plaintiff.

105. Defendant knew that its CoolSculpting System device was unreasonably dangerous, unsafe, and/or defective and could cause harm to those who used it, including Plaintiff. Specifically, Defendant knew that its medical device can cause Paradoxical Adipose Hyperplasia (PAH).

106. Defendant advertised CoolSculpting as a non-invasive procedure, designed to reduce fat. None of Defendant's advertising, marketing, or informational materials, to the Plaintiff, mentioned that CoolSculpting can cause a condition that results in a permanent disfigurement that can only be resolved by surgery.

107. Plaintiff relied on the skill and judgement of the Defendant and Defendant's representations that the device was adequately tested and rendered safe to use for its intended purpose.

108. Plaintiff became interested in and underwent the CoolSculpting procedure based on the Defendant's representation about the procedure.

109. Because of the innate defective nature of the CoolSculpting System device, Plaintiff and the individual performing the CoolSculpting procedure on Plaintiff, through the use of reasonable care could not have discovered the defective nature of the CoolSculpting System device or its perceived dangers.

110. As the direct and proximate result of Defendant's conduct, Plaintiff sustained serious injuries that were directly caused by the defective, unsafe and unreasonably dangerous CoolSculpting System device that could not safely be used for the purpose for which it was marketed, advertised, promoted and intended. Specifically, Defendant's CoolSculpting device caused Plaintiff to suffer a permanent enlargement and hardening of fat tissue which can only be removed through invasive plastic surgery. Ultimately, Defendant's medical device caused Plaintiff to suffer the exact outcome it promised to avoid.

111. Defendant is strictly liable for Plaintiff's damages.

112. As the direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered and continues to suffer economic losses, emotional distress, permanent disfigurement, physical pain, mental anguish, diminished enjoyment of life and future medical expenses.

## COUNT II
## STRICT PRODUCT LIABILITY – FAILURE TO WARN

113. Plaintiff incorporates the substantive allegations contained in Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

114. Defendant is, and at all times mentioned in this Complaint was, engaged in the business of designing, manufacturing, assembling, and selling a medical device product known as CoolSculpting System with the purpose of gaining profits from the distribution thereof.

115. Defendant knew that its CoolSculpting System device was unreasonably dangerous, unsafe, and/or defective and could cause harm to those who used it, including Plaintiff. Specifically, Defendant knew that its medical device can cause Paradoxical Adipose Hyperplasia (PAH).

116. Defendant knew that PAH is not preventable and that there was a possibility that Plaintiff could develop PAH after undergoing the CoolSculpting procedure.

117. Defendant had superior knowledge about PAH because it was in possession and had access to facts and information about the condition that was not available to anyone else. As the manufacturer of the device, Defendant was a centralized hub of information about the device's adverse effects, including PAH. It had received thousands of reports of users developing the condition, had access to those person's medical records and information regarding diagnosis, treatment, and occurrence rate of PAH, which it did not disclose to the medical community.

118. Defendant had a duty to provide adequate warnings about PAH, a dangerous side effect of its CoolSculpting medical device, to Plaintiff's CoolSculpting provider.

119. Zeltiq failed to provide *adequate* warnings to Plaintiff's CoolSculpting provider because the language used by Zeltiq to describe PAH in its training materials:

   a.   was *inaccurate* in content and *ambiguous* in manner of expression;

   b.   did not adequately inform the provider about a condition which is: 1) unfamiliar to the medical community, 2) is only associated with the CoolSculpting device, and

3) about which Defendant had superior knowledge;

c.    creatively used words that did not provide enough specificity about the condition, which was necessary for the CoolSculpting provider to know about the risks of using the device;

d.    did not use concrete terms like "deformity" and "disfigurement" to describe PAH;

e.    did not definitively state that PAH can only be removed with invasive surgery;

f.    did not warn that it is likely that multiple surgeries may be necessary to remove PAH;

g.    used words such as "rare side effect" to imply that PAH is unlikely to occur.

120. Defendant is strictly liable for Plaintiff's damages because its product was defective due to its failure to adequately warn Plaintiff's CoolSculpting provider about the danger of the CoolSculpting devise.

121. As the direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered and continues to suffer economic losses, emotional distress, permanent disfigurement, physical pain, mental anguish, diminished enjoyment of life and future medical expenses.

<u>**COUNT III**</u>
<u>**NEGLIGENCE**</u>

122. Plaintiff incorporates the substantive allegations contained in Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

123. Defendant had superior knowledge about PAH because it was in possession and had access to facts and information about the condition that was not available to anyone else. As the manufacturer of the device, Defendant was a centralized hub of information about the device's adverse effects, including PAH. It had received thousands of reports of users developing the condition, had access to those person's medical records and information

regarding diagnosis, treatment, and occurrence rate of PAH, which it did not disclose to the medical community.

124. Plaintiff's CoolSculpting provider acted as the Defendant's agent in selling the CoolSculpting cycles, because Defendant, among other things, conducted itself in the following ways: 1) maintained control over the CoolSculpting cycles through its consumable card system, 2) shared profits with the provider on each cycle administered to patients, 3) provided forms and documents to the CoolSculpting provider with the CoolSculpting logo to use for CoolSculpting patients and 4) referred CoolSculpting patients to the CoolSculpting provider via its website.

125. Defendant owed a duty to protect Plaintiff from unreasonable risk of its CoolSculpting medical device which it knew had the ability to cause permanent injury resulting in the opposite effect of the device's advertised purpose.

126. Defendant had a duty to adequately inform Plaintiff's CoolSculpting provider that PAH is 1) a permanent deformity that may occur from CoolSculpting, 2) which will never resolve on its own, 3) requiring multiple plastic surgeries to remove, 4) the effect of PAH is the opposite of the intended result of CoolSculpting, 5) that males are more likely to develop PAH.

127. Defendant failed to exercise ordinary care when it used misleading language in describing PAH to the CoolSculpting provider that did not adequately inform about the seriousness of the condition. Defendant made ambiguous and inaccurate statements about the effect PAH has on the body, its permanency, treatment options, and rate of risk in the written materials it furnished to Plaintiff's CoolSculpting provider.

128. Due to Defendant's failure to use ordinary care, Plaintiff's CoolSculpting provider did not

and could not adequately inform Plaintiff about his risk of developing the serious and permanent condition. Consequently, Plaintiff was induced to undergo the CoolSculpting procedure and was permanently injured when he developed PAH.

129. Defendant also had a duty to warn Plaintiff about PAH in its advertisement materials which it focused directly toward him, such as commercials, website content, and the brochures and posters that it furnished to Plaintiff's CoolSculpting provider to use in the office.

130. Defendant failed to exercise ordinary care when it omitted any information regarding PAH in the CoolSculpting advertisement materials it direct toward Plaintiff.

131. Due to Defendant's failure to use ordinary care, Plaintiff was not aware of the serious and permanent adverse effect of CoolSculpting. Consequently, Plaintiff was induced to undergo the CoolSculpting procedure and was permanently injured when he developed PAH.

132. As the direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered and continues to suffer economic losses, emotional distress, permanent disfigurement, physical pain, mental anguish, diminished enjoyment of life and future medical expenses.

## COUNT IV
## NEGLIGENT MISREPRESENTATION

133. Plaintiff incorporates the substantive allegations contained in Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

134. Defendant had superior knowledge about PAH because it was in possession and had access to facts and information about the condition that was not available to anyone else. As the manufacturer of the device, Defendant was a centralized hub of information about the device's adverse effects, including PAH. It had received thousands of reports of users developing the condition, had access to those person's medical records and information

regarding diagnosis, treatment, and occurrence rate of PAH, which it did not disclose to the medical community.

135. Plaintiff's CoolSculpting provider acted as the Defendant's agent in selling the CoolSculpting cycles, because Defendant, among other things, conducted itself in the following ways: 1) maintained control over the CoolSculpting cycles through its consumable card system, 2) shared profits with the provider on each cycle administered to patients, 3) provided forms and documents to the CoolSculpting provider with the CoolSculpting logo to use for CoolSculpting patients and 4) referred CoolSculpting patients to the CoolSculpting provider via its website.

136. Defendant knew that its CoolSculpting medical device, which is advertised to reduce fat without surgery, can cause a condition (PAH) which creates the *opposite effect*. It knew that many CoolSculpting users had already developed PAH and have had to go through painful surgeries to remove it. It also knew that such information, if known, would dissuade people from undergoing the procedure. But, because Zeltiq profits from each CoolSculpting cycle performed on the end user, Defendant intentionally concealed information about the severity and frequency of PAH caused by its device and misrepresented material information about the condition, to the CoolSculpting providers and to the public. Zeltiq's intent in concealing and misrepresenting key information about the permanently disfiguring condition was to induce end users to undergo multiple CoolSculpting cycles.

137. Defendant knew that PAH will *never* resolve on its own and that the *only* means of removing it is through invasive plastic surgery but instead, it used false language in describing PAH to CoolSculpting providers, such as "will *probably* not resolve on its own"

and "surgical intervention *may* be required."

138. Defendant knew that PAH is a disfigurement or deformity to the body and that it is different from an "enlargement of fat" because the affected adipose tissue does not react in the same way to diet and exercise as non-PAH fat tissue, and therefore will never reduce in size even if the affected person loses weight. Defendant misrepresented the consequences of PAH to CoolSculpting providers by creatively using ambiguous language to describe the condition and intentionally avoiding concrete terms such as "deformity" and "disfigurement" to describe the effect of PAH on a person's body.

139. Defendant knew that one liposuction will not remove PAH and that additional surgeries such as secondary liposuction, abdominoplasty, or excision will be required. But, Defendant did not disclose this fact to CoolSculpting providers in any of its training materials or forms provided to them.

140. Based on the number of PAH reports Defendant received, it knew that the likelihood of developing PAH after CoolSculpting was *not* rare. It was also aware of reports from plastic surgeons who stated that the incidence rate of PAH in their own practice is as high as 1 in 129, not 1 in 4,000 as Defendant's consultant represented. Yet, Defendant used words such as "rare" and "small number of patients" to describe the risk of developing PAH in written materials such as User Manuals, slide-show presentations, training documents, and recommended sample consent forms, which it provided to Plaintiff's CoolSculpting provider. In making these statements it intended to induce the CoolSculpting provider and end users to believe that it is *unlikely* that a user will develop the condition.

141. Defendant also concealed the actual incidence rate of PAH to the CoolSculpting providers and to the public, while simultaneously relying on words "rare" and "small number" to sell

its device.

142. Defendant used paid consultants to disseminate confusing information regarding the incidence rate of PAH by publishing scholarly articles in which they *also* used words like "rare" and "very rare" to describe the side effect and presented conflicting statistical information about the risk of PAH.

143. Defendant reported *less than* 70 PAH events to the FDA, even though it knew of *at least* 2,827 cases of PAH.

144. Defendant used non-medical sales people to provide false information to CoolSculpting providers about the risk of PAH, who were financially incentivized to misrepresent information about adverse effects.

145. Defendant made these statements and concealed material facts about PAH without regard for the truth of the statements it was making.

146. Defendant made these statements and concealed material facts about PAH with intent to induce Plaintiff to undergo the CoolSculpting procedure.

147. As the result of Defendant's misrepresentations about PAH and concealment of key information regarding the condition, Plaintiff's CoolSculpting provider did not and could not adequately inform Plaintiff about his risk of developing the serious and permanent condition. Consequently, Plaintiff was induced to undergo the CoolSculpting procedure and was permanently injured when he developed PAH.

148. As the direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered and continues to suffer economic losses, emotional distress, permanent disfigurement, physical pain, mental anguish, diminished enjoyment of life and future medical expenses.

## COUNT V
## FRAUDULENT MISREPRESENTATION AND CONCEALMENT

149. Plaintiff incorporates the substantive allegations contained in Paragraphs 1 through 100 of this Complaint as if fully set forth herein.

150. Defendant had superior knowledge about PAH because it was in possession and had access to facts and information about the condition that was not available to anyone else. As the manufacturer of the device, Defendant was a centralized hub of information about the device's adverse effects, including PAH. It had received thousands of reports of users developing the condition, had access to those person's medical records and information regarding diagnosis, treatment, and occurrence rate of PAH, which it did not disclose to the medical community.

151. Plaintiff's CoolSculpting provider acted as the Defendant's agent in selling the CoolSculpting cycles, because Defendant, among other things, conducted itself in the following ways: 1) maintained control over the CoolSculpting cycles through its consumable card system, 2) shared profits with the provider on each cycle administered to patients, 3) provided forms and documents to the CoolSculpting provider with the CoolSculpting logo to use for CoolSculpting patients and 4) referred CoolSculpting patients to the CoolSculpting provider via its website.

152. Defendant knew that its CoolSculpting medical device, which is advertised to reduce fat without surgery, can cause a condition (PAH) which creates the *opposite effect*. It knew that many CoolSculpting users had already developed PAH and have had to go through painful surgeries to remove it. It also knew that such information, if known, would dissuade people from undergoing the procedure. But, because Zeltiq profits from each CoolSculpting cycle performed on the end user, Defendant intentionally concealed

information about the severity and frequency of PAH caused by its device and misrepresented material information about the condition, to the CoolSculpting providers and to the public. Zeltiq's intent in concealing and misrepresenting key information about the permanently disfiguring condition was to induce end users to undergo multiple CoolSculpting cycles.

153. Defendant knew that PAH will *never* resolve on its own and that the *only* means of removing it is through invasive plastic surgery but instead, it used false language in describing PAH to CoolSculpting providers, such as "will *probably* not resolve on its own" and "surgical intervention *may* be required."

154. Defendant knew that PAH is a disfigurement or deformity to the body and that it is different from an "enlargement of fat" because the affected adipose tissue does not react in the same way to diet and exercise as non-PAH fat tissue, and therefore will never reduce in size even if the affected person loses weight. Defendant misrepresented the consequences of PAH to CoolSculpting providers by creatively using ambiguous language to describe the condition and intentionally avoiding concrete terms such as "deformity" and "disfigurement" to describe the effect of PAH on a person's body.

155. Defendant knew that one liposuction will not remove PAH and that additional surgeries such as secondary liposuction, abdominoplasty, or excision will be required. But, Defendant did not disclose this fact to CoolSculpting providers in any of its training materials or forms provided to them.

156. Based on the number of PAH reports Defendant received, it knew that the likelihood of developing PAH after CoolSculpting was *not* rare. It was also aware of reports from plastic surgeons who stated that the incidence rate of PAH in their own practice is as high as 1 in

129, not 1 in 4,000 as Defendant's consultant represented. Yet, Defendant used words such as "rare" and "small number of patients" to describe the risk of developing PAH in written materials such as User Manuals, slide-show presentations, training documents, and recommended sample consent forms, which it provided to Plaintiff's CoolSculpting provider. In making these statements it intended to induce the CoolSculpting provider and end users to believe that it is *unlikely* that a user will develop the condition.

157. Zeltiq concealed its knowledge of the unreasonably dangerous risks of its CoolSculpting device from the CoolSculpting providers and the public, while simultaneously relying on words "rare" and "small number" to sell millions of CoolSculpting cycles to unsuspecting users, such as Plaintiff.

158. Defendant used paid consultants to disseminate confusing information regarding the incidence rate of PAH by publishing scholarly articles in which they *also* used words like "rare" and "very rare" to describe the side effect and presented conflicting statistical information about the risk of PAH.

159. Defendant reported *less than* 70 PAH events to the FDA, even though it knew of *at least* 2,827 cases of PAH.

160. Defendant used non-medical salespeople to provide false information to CoolSculpting providers about the risk of PAH, who were financially incentivized to misrepresent information about adverse effects.

161. Defendant made these statements and concealed material facts about PAH knowing that the representations were *false* and that the concealed facts were material to the Plaintiff's decision making about undergoing the CoolSculpting procedure.

162. Defendant made these statements and concealed material facts about PAH with intent to

induce Plaintiff to undergo the CoolSculpting procedure.

163. As the result of Defendant's misrepresentations about PAH and concealment of key information regarding the condition, Plaintiff's CoolSculpting provider did not and could not adequately inform Plaintiff about his risk of developing the serious and permanent condition. Consequently, Plaintiff was induced to undergo the CoolSculpting procedure and was permanently injured when he developed PAH.

164. As the direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered and continues to suffer economic losses, emotional distress, permanent disfigurement, physical pain, mental anguish, diminished enjoyment of life and future medical expenses.

## PUNITIVE DAMAGES

165. Plaintiff incorporates the substantive allegations contained in Paragraphs 1 through 164 of this Complaint as if fully set forth herein.

166. Defendant's conduct in deceiving the CoolSculpting provider and the public, including the Plaintiff, about the seriousness and the substantial risk of developing Paradoxical Adipose Hyperplasia, concealing material information regarding the incidence rate, severity, and permanency of the condition, was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons, including Plaintiff, exposed to such conduct.

167. Defendant, as a corporation, actively and knowingly participated in the dissemination of misrepresentations and concealment of material information related to Paradoxical Adipose Hyperplasia and its CoolSculpting System device.

168. Therefore, Defendant is liable for punitive damages under Fla. Stat. §768.72 (2019) as well as other applicable state and federal statutes, codes, laws and rules.

## REQUEST FOR RELIEF

**WHEREFORE**, Terrance Nelson Cates, the Plaintiff, respectfully requests this Court enter a judgment:

1. Ordering the Defendant Zeltiq Aesthetics, Inc. to pay compensatory damages to Plaintiff for past and future economic and non-economic damages, including but not limited to pain and suffering, permanent disfigurement, economic loss for the CoolSculpting procedures, future medical expenses, mental anguish, and loss of enjoyment of life;

2. Ordering the Defendant Zeltiq Aesthetics, Inc. to pay punitive damages for the wanton, willful, fraudulent and reckless conduct against Plaintiff;

3. Ordering the Defendant Zeltiq Aesthetics, Inc. to pay reasonable attorney's fees;

4. Ordering the Defendant Zeltiq Aesthetics, Inc. to pay court costs; and

5. Granting any and all other relief the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues raised in this Amended Complaint.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was filed with the Clerk of the Court via the CM/ECF system, which will send a notice of electronic filing to Zeltiq Aesthetics, Inc.**,** Shook, Hardy & Bacon LLP, Brian T. Guthrie Esq. and Aimee T. Canty, Esq., e-mail addresses bguthrie@shb.com and acanty@shb.com, on or about March 25, 2020.

Respectfully Submitted,

*s/Louiza Tarassova*
By: Louiza Tarassova, Esq.
Florida Bar Number: 96149
The Law Office of Louiza Tarassova, P.A.
2050 State Road 436, Unit 144

Winter Park, FL  32792
Telephone: (407) 622-1885
Fax: (407) 536-5041
E-Mail: louiza@mylawadvocate.com
Secondary E-Mail: service@mylawadvocate.com

*Counsel for Plaintiff, Terrance Nelson Cates*