UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TERRANCE NELSON CATES, | ) |
| Plaintiff, | ) CIVIL ACTION No. 20-mc-91234-NMG |
| v. | ) |
| ZELTIQ ASETHETICS, INC., | ) |
| Defendant. | ) |

ORDER ON NON-PARTY DR. R. ROX ANDERSON'S
MOTION TO QUASH DEPOSITION SUBPOENA
AND FOR PROTECTIVE ORDER (#1).

KELLEY, CHIEF U.S.M.J.

I. Introduction.

Non-party Dr. R. Rox Anderson, a resident of Boston, moves pursuant to Federal Rules of Civil Procedure 45 and 26 to quash a deposition subpoena and for a protective order. (#1.) This matter arises in connection with a case pending in the United States District Court for the Middle District of Florida, *Cates v. Zeltiq Aesthetics, Inc.*, No. 6:19-cv-1670. *Id.* at 1; *see* #1-4 (Exhibit D, amended complaint). In the underlying case, plaintiff Terrence Cates, who lives in the Bahamas, sued Zeltiq Aesthetics, Inc., the manufacturer of a device that removes subcutaneous fat from a person's body, a process that the manufacturer calls "CoolSculpting®." (#1 at 1.) Mr. Cates alleges that he was injured after he had CoolSculpting performed on him in February and May 2018, at a spa in Orlando, Florida. (#1-4 ¶¶ 84, 87, 92.)

Dr. Anderson is a professor of dermatology at Harvard Medical School and is the director of the Wellman Center for Photomedicine at Massachusetts General Hospital (MGH). (#1 at 1.)

1

He is also an adjunct professor at the Massachusetts Institute of Technology. *Id*. at 4. He has been awarded over 60 patents and has authored or co-authored over 250 scientific books and papers. *Id*. "Among his other contributions, Dr. Anderson conceived and developed many of the non-scarring laser treatments now widely used in medical care." *Id*. Research that he and colleagues conducted nearly twenty years ago led to a technique called cryolipolysis, which is a "non-invasive method for selectively cooling subcutaneous fat, thereby inducing the breakdown of fat cells in the body." *Id*. at 2. Zeltiq purchased licensing rights to the cryolipolysis process from Dr. Anderson's employer, MGH, and using it, developed the CoolSculpting device. (#8 at 6.)

Dr. Anderson was noticed for a deposition after plaintiff identified him as a fact witness. (#1 at 5.) He argues that he is not a fact witness, and that here, where he had no part in plaintiff's care, plaintiff is improperly seeking to compel involuntary expert testimony from him. *Id*. at 10.

Oral argument was held on this matter on June 25, 2020, after which the parties were ordered to further confer. (#13.) They did confer, and then filed a status report stating they could not reach agreement. (#15.) The matter is fully briefed (##8, 11) and is ready for disposition.

II. <u>Facts</u>.

Plaintiff, alleging product liability claims of defective design and failure to warn, negligence, negligent misrepresentation, and fraudulent misrepresentation and concealment in his amended complaint (#1-4), claims that he suffered "a permanent deformity to his body caused by Paradoxical Adipose Hyperplasia (PAH), an adverse effect of the [CoolSculpting] device." (#8 at 1.)[1] Plaintiff asserts that Dr. Anderson is "a key fact witness" in the underlying litigation. *Id*. at 3. Plaintiff had the idea to depose Dr. Anderson when Zeltiq "chose to pursue an aggressive defense

---

[1] PAH is described as "enlargement and in some cases hardening of fat in the treated area." (#1-2 at 2.)

in this case and exhibited a hardline refusal to admit to basic facts about its device[.]" *Id*. at 5. For example, Zeltiq refused to admit that "the purpose of the Coolsculpting[] system device is to reduce adipose tissue (fat) via a noninvasive procedure[,]" to admit that "all of [d]efendant's CoolSculpting[] system devices are known to cause Paradoxical Adipose Hyperplasia (hereinafter 'PAH')[,]" and to admit that "PAH does not resolve on its own." (#1 at 6.) Dr. Anderson is a fact witness because "he was in the position of being an independent source of key information about the CoolSculpting[] device's ability to cause harm, via PAH, and Zeltiq's knowledge thereof." (#8 at 5.) Plaintiff states: "Had Zeltiq answered [p]laintiff's Request for Admission in an honest and fair way, [p]laintiff would probably not have sought out Dr. Anderson's testimony." (#1-5 at 5.)

Plaintiff argues that "Dr. Anderson's connection to [d]efendant's medical device is beyond simply being a third-party researcher of the underlying cryolipolysis process . . . ." (#8 at 5.) These connections are as follows: in 2005, Zeltiq purchased licensing rights to the cryolipolysis process from Dr. Anderson's employer, MGH; Dr. Anderson served on Zeltiq's Medical Advisory Board from 2012 to 2014; Zeltiq referred some initial patients who developed PAH to Dr. Anderson at the dermatology lab at MGH and "received feedback from Dr. Anderson in regard to [PAH]"; at Zeltiq's request, in 2012, Dr. Anderson drafted a report about PAH, which the company disseminated to CoolSculpting providers as late as November 2018; in 2014, he wrote two scholarly articles about cryolipolysis, one of which was about PAH; in 2015, he published another article about cryolipolysis's "benefits of causing significant and prolonged decreases in cutaneous sensitivity"; and in July 2018, he was interviewed on a local news outlet in Boston, Massachusetts, promoting the CoolSculpting device. *Id*. at 6-8.

III. <u>The Motion to Quash</u>.

Dr. Anderson asserts that the information about which the plaintiff seeks to have him testify "can be obtained from other sources, including [p]laintiff's treating physicians and retained experts who, of course, may rely on Dr. Anderson's published writings." (#1 at 2.) In an affidavit, Dr. Anderson states that he knows nothing about plaintiff and had no part in his treatment, and he was not involved in designing the CoolSculpting device, in drafting the warning language that appears in the CoolSculpting Directions for Use, or in reporting adverse events relating to CoolSculpting to the Federal Food and Drug Administration. (#1-2 at 2.) He says that his 2014 article about PAH was not written for Zeltiq or at Zeltiq's request, and he has not studied PAH since the article was published. *Id*. Other researchers have studied PAH and have "more relevant and up-to-date information" than Dr. Anderson does. *Id.* Finally, he has not been retained as an expert, and does not want to testify in the case. *Id*. at 2-3.

IV. <u>The Law</u>.

Fed. R. Civ. P. 26(c) allows a court to issue an order "to protect a party from annoyance, embarrassment, oppression, or undue burden or expense[.]" Fed. R. Civ. P. 26(c). The party seeking the order has the burden of demonstrating "good cause" for it. *Id.*; *Secs. & Exch. Comm'n v. Lemelson*, 334 F.R.D. 359, 361 (D. Mass. Jan. 28, 2020).

Third-party subpoenas issued in civil cases in federal court are governed by Federal Rule of Civil Procedure 45. "A Rule 45 subpoena must fall within the scope of proper discovery under Fed. R. Civ. P. 26(b)(1)." *Green v. Cosby*, 152 F. Supp.3d 31, 34 (D. Mass. 2015) (quoting *In re New Eng. Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. MDL 13-2419, 2013 WL 6058483, at *4 (D. Mass. Nov. 13, 2013)), *modified on reconsideration,* 160 F. Supp.3d 431 (D. Mass. 2016). Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain

discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and [is] proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). While the Rule "generally permits liberal discovery of relevant information[,]" *see Cumby v. Am. Med. Response, Inc.*, No. 3:18-cv-30050-MGM, 2019 WL 1118103, at *3 (D. Mass. Mar. 11, 2019) (citations omitted), the scope of discovery is not unlimited, and the court must restrict discovery that is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive[,]" or is outside the scope of discovery permitted by Rule 26(b)(1). Fed. R. Civ. P. 26(b)(2)(C).

Concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs for discovery. *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, 755 F.3d 55, 59 (1st Cir. 2014). A court may quash or modify a subpoena under Rule 45 if it subjects the recipient to "undue burden," Fed. R. Civ. P. 45(d)(3)(A)(iv), or if the subpoena requires the recipient to "disclos[e] an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party." Fed. R. Civ. P. 45(d)(3)(B)(ii). The court may order appearance under specified conditions if the serving party "shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship[,]" and "ensures that the subpoenaed person will be reasonably compensated." Fed. R. Civ. P. 45(d)(3)(C).

V. <u>Analysis</u>.

The court allows the motion to quash and for a protective order. Plaintiff's claims focus on allegations that the CoolSculpting device was unreasonably dangerous, and that Zeltiq provided inadequate warnings concerning the risk of PAH. (#1-4 ¶¶ 2-3, 104, 127, 136, 140.) His stated purpose in deposing Dr. Anderson, to have him confirm facts that Zeltiq refuses to admit, such as

"the purpose of the Coolsculpting[] system device is to reduce adipose tissue (fat) via a noninvasive procedure," "all of [d]efendant's CoolSculpting[] system devices are known to cause [PAH,]" and "PAH does not resolve on its own[,]" (#1 at 6), is clearly a violation of Rule 45's prohibition against forcing an unretained expert to testify. Plaintiff may hire his own expert to support his assertions about the purpose of the device, whether it causes PAH, and whether Zeltiq's warnings were adequate.

While plaintiff mainly wants to question Dr. Anderson concerning his technical knowledge about cryolipolysis, plaintiff does state in passing that he also wants to ask Dr. Anderson about Zeltiq's knowledge of PAH. (#8 at 5.) In balancing the plaintiff's need to discover information about what Zeltiq knew about PAH from Dr. Anderson against the burden to Dr. Anderson of sitting for a deposition, the court considers whether Dr. Anderson even possesses this information, and if there are alternate sources available to plaintiff. First, it is clear that Dr. Anderson's connections to Zeltiq, such as the fact that he was on the Medical Advisory Board of Zeltiq from 2012 to 2014 and that he wrote a report at the request of Zeltiq about PAH in 2012, are distant in time from plaintiff's injury in 2018. Dr. Anderson swears in his affidavit that he was not involved in the creation of warnings or marketing for CoolSculpting and was not involved in "any post-market surveillance related to CoolSculpting." (#1-2 at 2.) He has not "written, studied, or conducted research on cryolipolysis and PAH since" his article on PAH was published in 2014. *Id*. Thus, there is no reason to believe he even has relevant information about what Zeltiq knew about PAH with regard to the timeframe in this case. Second, there are obviously better sources of this information, for example, documents that Zeltiq possesses, that would demonstrate what Zeltiq knew about the risks posed by the use of its device. In fact, in his amended complaint, plaintiff

clearly states that Zeltiq knows how many people suffered PAH after undergoing CoolSculpting and that Zeltiq "had superior knowledge about" this data. (#1-4 at ¶¶ 47-53.)

In short, Dr. Anderson knows little about the underlying case that would "describe specific occurrences in dispute . . . ." Fed. R. Civ. P. 45(d)(3)(B)(ii). The plaintiff essentially seeks to depose him as an unretained expert, which Rule 45 forbids. The court allows Dr. Anderson's motion.

VI. Conclusion.

For the reasons set out above, plaintiffs' motion to quash and for a protective order (#1) is granted.

September 14, 2020                    /s/ M. Page Kelley
                                      M. Page Kelley
                                      Chief United States Magistrate Judge